SCOTT E. BRADFORD, OSB # 062824
United States Attorney
District of Oregon
**SCOTT M. KERIN, OSB # 965128**
Assistant United States Attorney
Scott.Kerin@usdoj.gov
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:26-mj-00143 |
| v. | **GOVERNMENT'S MOTION TO STAY AND REVOKE RELEASE ORDER** |
| **BALTAZAR PLATA BRINGAS**, | |
| **Defendant.** | |

The government asks the court to stay the U.S. Magistrate Judge's release order and, after a hearing, revoke the defendant's pretrial release order and find that he is an unacceptable risk of non-appearance and danger to the community.

The defendant is a large scale drug dealer – selling both methamphetamine and fentanyl – who was working for a Mexico-based drug trafficking organization, he possessed three firearms, he is a citizen of Mexico who illegally entered the United States in 2023, his family still lives in Mexico, and he has only resided in Oregon for 10 months. He has no substantial ties to Oregon and cannot legally work within the United States. The defendant was caught with approximately eight (8) kilograms of methamphetamine and has now been charged in a criminal complaint with the possession with intent to distribute 500 grams or more of a mixture and substance containing

**Government's Motion to Stay and Revoke Release Order**                    **Page 1**

methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(A).  He faces a mandatory minimum of 10 years in federal prison, a maximum sentence of life imprisonment, and a Sentencing Guideline range on the seized methamphetamine alone of 151 to 188 months' imprisonment.  His possession of the firearms, which he told the agents he accepted as payment for drugs after receiving authorization from his bosses in Mexico, make him ineligible for "safety valve" relief and thus he is currently unable to escape the 10-year mandatory minimum sentence that would result from a conviction.[1]  Under the "totality of the circumstances" he is a danger to the community and a significant risk on non-appearance and no condition or combination of conditions can acceptably mitigate those risks.

## I.     Summary of the Case.

### Defendant's Arrest

On the morning of May 26, 2026, DEA utilized a Confidential Source (CS) to call a known Mexico-based source of supply to order kilogram quantities of both methamphetamine and fentanyl.  This Mexico-based source of supply operated as a dispatcher in which the person takes the drug orders from the customer then relays them to a delivery person who in turn brings the drugs to the customer.  Such dispatchers are rarely located in the same area as their customer base in an effort to avoid apprehension by law enforcement.  The dispatcher told CS that they would have a person in the Portland, Oregon, area later that same day who could fulfill their

---

[1]  *See* 18 U.S.C. § 3553(f)(2) providing that the "safety valve" does not apply where the defendant possesses a firearm in connection with the offense.

**Government's Motion to Stay and Revoke Release Order**                    **Page 2**

methamphetamine order, but that the fentanyl would not be available until the following day.[2] The CS agreed to meet the courier at a Mall 205 in Portland, Oregon.

Prior to the deal, Investigators met with CS at a nearby neutral location where they searched CS's person and vehicle for drugs, weapons, bulk cash, and other contraband.  Finding no such items, Investigators provided the CS with an audio recording/listening device. Investigators then followed the CS from the neutral location to the prearranged deal location. Simultaneously, other Investigators established surveillance of the prearranged deal location in anticipation of the drug deal.

In the early afternoon of May 26, 2026, a black Hyundai Elantra parked beside CS.  The individual driving the Elantra, later identified as the defendant, met with CS and gave CS a half-pound of methamphetamine in exchange for U.S. currency.  The defendant  indicated this was "a sample" from the larger quantity of methamphetamine.  The defendant then drove away in the Elantra.

Investigators followed the defendant to an Enterprise rent-a-car in McMinnville, Oregon. Investigators watched as the defendant exchanged the Elantra for a grey Honda Civic.  The Civic then drove to a residence on SE Brooks Street, in McMinnville, Oregon.  A few hours later the defendant came out of the residence and got back into the Civic and drove away.

---

[2]    When the CS was negotiating with the dispatcher known as SP-9493 to purchase drugs, the initial purchase order was for methamphetamine and fentanyl, which SP-9493 agreed to provide.  SP-9493 is being identified based upon the last four digits of their telephone numbers. SP-9493 subsequently told the CS that the fentanyl would not arrive until the following day and Investigators made the decision to proceed with the methamphetamine purchase and arrest of the delivery person.

**Government's Motion to Stay and Revoke Release Order**                                        **Page 3**

Investigators followed the defendant away from McMinnville as he drove back to the deal location in Portland, Oregon, to meet with the CS once again. The defendant told CS that he had 16-and-a-half-pounds with him. Investigators, hearing this over the listening device, then initiated the arrest of the defendant. In doing so that used the blue and red police lights mounted on their government vehicles. Investigators, wearing vests clearly identifying them as police, approached the defendant and announced themselves as police as they took the defendant into custody. The defendant was sitting in the driver's seat of the Civic. Investigators identified the defendant by his Oregon State identification card.

The Investigators asked for, and the defendant gave them, consent to search his vehicle. Investigators also deployed a narcotics detection K9 which alerted to the odor of narcotics coming from the Civic. Investigators searched the defendant's Civic and found and seized multiple clear plastic bags containing suspected methamphetamine that were found within a brown, Red Robin bag that was behind the driver's seat. There were approximately 17 bags of suspected methamphetamine that were seized, 16 of which appeared to be one-pound each. The 17th bag appeared to be only partially full. Samples of the suspected methamphetamine were later field tested and tested presumptively positive for the presence of methamphetamine, a Schedule II controlled substance. Based on CS information regarding receiving a sample earlier in the day from the defendant, Investigators believe the defendant took the methamphetamine sample from one of the packages of methamphetamine found in the car.

The defendant was advised of his constitutional *Miranda* rights in Spanish, by a Spanish speaking Investigator, and the defendant acknowledged understanding his rights. The defendant was then interviewed in Spanish. When asked why he was here, the defendant said he was there to deliver methamphetamine. The defendant said he was supposed to receive just over $18,000

**Government's Motion to Stay and Revoke Release Order**                    **Page 4**

dollars for the methamphetamine. The defendant also explained that he had worked for two individuals in Mexico and did not know their names, but did have their phone numbers, herein referred to by the last four digits of those numbers as SP-8201 and SP-9493.

The defendant initially downplayed his involvement by saying that he had only worked for the dispatchers in Mexico for 10 days. This contradicted what Investigators later found on the defendant's phone. As the interview continued, the defendant explained that about two weeks ago he had been sent with an unknown amount of U.S. currency to Los Angeles, California, to buy about 40 pounds of methamphetamine. The defendant said he was told that he would then be directed to deliver narcotics to various customers in exchange for cash. The defendant stated he never knew just how much money was changing hands because the dispatchers had different prices for each customer. The defendant also said he was paid $1,400 per week for his work. The defendant also told investigators that he had previously traveled to Los Angeles on May 24, 2026; to buy about 40 pounds of methamphetamine and this prior trip took him about 30 hours.

When asked about what he used to do in Mexico the defendant told the Investigators that he was a lawyer and used to work for the Sinaloa drug cartel representing "sicarios" (which is the word used to refer to a hitman, assassin, or contract killer), as well as other people who worked for the cartel. After the defendant had what he described as a run in with the cartel, he said he stopped working for them and fled to the United States in 2023.

The defendant was also asked for and subsequently gave Investigators consent to search his residence on SE Brooks Street, in McMinnville, Oregon. The defendant also provided Investigators the door code and told them that there were firearms in the closet and U.S. currency in the kitchen table. The defendant said the money was from selling narcotics. The defendant

**Government's Motion to Stay and Revoke Release Order**                    **Page 5**

also said he had taken the firearms in trade for narcotics with permission from the dispatchers in Mexico. The defendant said he did not carry the firearms with him on narcotics transactions. Police located three firearms, one semi-automatic assault-style rifle and two handguns, ammunition, and a large amount of U.S. currency in the residence. Investigators estimate that the amount of cash seized was approximately $25,000. A formal bank count is pending.

The defendant also gave Investigators consent to search his phone. The conversations with SP-8201 went back to May 12, 2026. In the messages to and from SP-8201 Investigators observed several photographs and videos of narcotics being shared between people. In these conversations with SP-8201 there were also conversations where SP-8201 was directing the defendant to distribute fentanyl to customers. There were also pictures of fentanyl that the defendant sent back to SP-8201, some of which are depicted below:

 

 

The conversations with SP-9493 went back to April 21, 2026.  In the first few voice messages from SP-9493, this person said they would pay the defendant $1,250 per week and start him off with 30 or 40 pounds of methamphetamine.  In the messages to and from SP-9493 there were also several photographs and videos of narcotics, money remitter receipts, and drug ledgers being shared between the two people.

Both of the Mexico-based dispatchers were also sending the defendant addresses in the Portland, Oregon, metropolitan area, which is consistent with dispatchers sending their delivery person the addresses of the customers they are supposed to deliver drugs to.

The seized methamphetamine, which included the amount the defendant sold to the CS and what was found within the defendant's vehicle, including packaging, was weighed and found to be approximately 8,063.2 grams. The seized methamphetamine, firearms, and cash are depicted in the photographs below.

**Government's Motion to Stay and Revoke Release Order**                                **Page 7**






On May 27, 2026, a Criminal Complaint and Arrest Warrant were sought and granted.

After the defendant's arrest the CS informed Investigators that SP-8201 sent a message stating that the defendant had taken a video of the CS and they knew who the CS was. SP-8201 accused the CS of being a government agent and said he was going to send people to kill the CS. The Investigators view this as a credible threat given the defendant's history and what is known of the dispatchers, who they believe are working with the Sinaloa cartel.

**Initial Appearance and Detention Hearing**

On May 28, 2026, the defendant made his initial appearance in federal court. U.S. Pretrial Services recommended defendant's release from custody on conditions of supervision. Defendant sought his release and the government objected. The U.S. Magistrate Judge granted the defendant's release to the Northwest Residential Re-Entry Center.

While the government appreciates the Court's willingness to give the defendant a chance on release, we believe the U.S. Magistrate's faith in the defendant is misplaced in this situation. The placement beds available at the Residential Re-Entry Center are scarce and valuable in helping defendants transition back into the community. We do not believe that a Residential Re-Entry Center placement is appropriate in this case given the risk the defendant presents to the community and his substantial risk of flight. Thus, we ask the Court to stay the U.S. Magistrate Judge's release order and, after a hearing, revoke the pretrial release order and find that the defendant is an unacceptable risk of non-appearance and danger to the community for the reasons outlined below.

**II.     Legal Standard to Stay Release Order.**

The district court has the authority to stay and review a magistrate's release order. 18 U.S.C. § 3145(a) provides:

**Government's Motion to Stay and Revoke Release Order**                                              **Page 9**

(a)     Review of a Release Order.—If a person is ordered released by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court—

(1)     the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release; and

(2)     the person may file, with the court having original jurisdiction over the offense, a motion for amendment of the conditions of release. The motion shall be determined promptly.

18 U.S.C. § 3145(a).

In exercising this review authority, the U.S. District Court also has the inherent authority to stay a magistrate's release order. *United States v. Brigham*, 569 F.3d 220, 230 (5th Cir. 2009); *United States v. Petersen*, 577 F.Supp.2d 1124, 1129 (E.D. Cal. 2008). In deciding whether to stay a magistrate judge's decision, the Court should consider "(1) whether the stay applicant has made a strong showing that [he/she] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

The district court reviews a magistrate judge's decision denying detention pending trial *de novo*. *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990). In doing so, the district court should "make its own independent determination," giving the magistrate judge's findings "no deference." *Id.*

The Bail Reform Act provides that defendants shall be detained pending trial where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Based upon

the nature of the crime, the presumption of detention under the Bail Reform Act that arises from the charge in the criminal complaint, defendant's possession of three firearms, defendant's residency status and Mexican citizenship, and defendant's lack of ties to Oregon and familial connections to Mexico, he is both a danger to the community and a substantial risk of non-appearance at future court proceedings and should be detained.

## III.    The Court should Stay the Magistrate's Release Order Pending a Hearing.

The Court should stay the Magistrate Judge's release order while this motion is pending based upon a review of the four *Nken* factors.  The facts above demonstrate that the United States has made a strong showing that it is likely to succeed on the merits.  Furthermore, based upon the nature of the charges and defendant's history, there may be irreparable injury to the United States and substantial injuries to others absent a stay because, if defendant is released, he is likely to both flee and venture back into drug trafficking.  And, for the same reasons, the public interest favors a stay.

## IV.    Applicable Law.

### A.    Rules of Evidence Do Not Apply at Detention Hearing.

The Federal Rules of Evidence do not apply in detention proceedings.  Fed. R. Evid. 1101(d)(3); 18 U.S.C. § 3142(f).  Accordingly, both the government and the defense may present evidence by proffer or hearsay.  *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986); *see also United States v. Bibbs*, 488 F.Supp.2d 925, 925-26 (N.D.Cal. 2007).

### B.    Standard of Review by the District Court is *De Novo*.

The district court reviews a magistrate judge's release decision *de novo*.  *Koenig*, 912 F.2d at 1193.  In doing so, as noted above, the district court should "make its own independent determination," giving the magistrate judge's findings "no deference."  *Id.*

**Government's Motion to Stay and Revoke Release Order**                                      **Page 11**

**C.       There is a Rebuttable Presumption of Detention.**

Under the Bail Reform Act, 18 U.S.C. § 3142, *et seq.*, which governs the detention of a defendant pending trial, the Court shall order a defendant detained if, after a hearing, it finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." Generally, the United States bears the burden of establishing danger to the community by clear and convincing evidence; risk of flight need only be proved by a preponderance of the evidence. *United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990); *Winsor*, 785 F.2d at 757.

Where there is probable cause to believe that the defendant committed a Title 21 narcotics offense and the maximum penalty for that offense is a term of imprisonment of 10 years or more, or a violation of Title 18, United States Code, Section 924(c), the law creates a presumption that no condition or combination of conditions of release will reasonably assure the appearance of the person as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(A) and (B). In such a case, the burden of proof shifts to the defendant to rebut the presumption of detention. *United States v. Carbone*, 793 F.2d 559, 560 (3rd Cir. 1986). The criminal charges in this case create a presumption of pretrial detention.

Concern about the safety of the community is not limited to concerns about violence; rather it is the *risk* that a defendant will continue committing crimes while on release, such as drug dealing, that warrants their continued detention as a danger to the community:

> [T]he language referring to the safety of the community refers to the danger that the defendant **might** engage in criminal activity to the detriment of the community. The committee intends that the concerns about safety be given a broader construction than merely danger of harm involving physical violence. This principal was recently endorsed in *United States v. Provenzano and Andretta*, in which it was held that the concept of 'danger' . . . extended to nonphysical harms such as corrupting

a union. **The committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the "safety of any other person or the community."**

S.Rep. No. 98-225, 98th Cong., 1st Sess. (1983), *reprinted in* 1984 U.S.C.C.A.N 3182, 3195 (Bail Reform Act)(emphasis added); *see also United States v. Hare*, 873 F.2d 796, 798-99 (5th Cir.1989)(**Congress has determined "that drug offenders pose a special risk of flight and dangerousness to society**.") (emphasis added).

The Senate Report further explained *why* they created the presumption that there was no condition or combination of conditions of release that will reasonably ensure the appearance of drug dealers or the safety of the community:

> These [the crimes outlined in 18 U.S.C. § 3142(e)] are serious and dangerous federal offenses. The drug offenses involve either trafficking in opiates or narcotic drugs, or trafficking in large amounts of other types of controlled substances. It is well known that drug trafficking is carried on to an unusual degree by persons engaged in continuing patterns of criminal activity. Persons charged with major drug felonies are often in the business of importing or distributing dangerous drugs, and thus, **because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism**.

S.Rep. No. 98-225, 98th Cong., 1st Sess. (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3203 (Bail Reform Act) (emphasis added).

The presumption in favor of detention, as both a flight risk and danger to the community, does not vanish if a defendant comes forward with some evidence to rebut it, but rather it remains an evidentiary factor to be evaluated. *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir.1985); *see also United States v. Rueben*, 974 F.2d 580, 586 (5th Cir.1992); *United States v. Rodriguez*, 950 F.2d 85, 88 (2nd Cir.1991); *United States v. Hare*, 873 F.2d 796, 798 (5th Cir.1989). Were the presumption to vanish, "courts would be giving too little deference to Congress' findings regarding this class." *United States v. Martir*, 782 F.2d 1141, 1144 (2nd Cir.1986).

**Government's Motion to Stay and Revoke Release Order**                    **Page 13**

The degree of danger posed by a defendant charged with narcotics trafficking is critical. *United States v. Leon*, 766 F.2d 77, 81 (2nd Cir. 1985). To determine that degree and decide if a defendant should be detained pending trial, a judicial officer must look to the nature and circumstances of the crime charged; whether the crime involved violence or drugs; the personal history of the person, the seriousness of the danger posed by the person's release; and, the evidence of the individual's guilt. *Id.*

Evidence of defendant's family ties in the area, residence in the community, and employment history should have **no bearing** on the court's determination of dangerousness and cannot rebut the presumption that arises under the statute. *See* S. Rep. No. 225, 98th Cong., 1st Sess. 24 (1983) (minimizing community ties and pointing to the "growing evidence that the presence of this factor does not necessarily reflect a likelihood of appearance and has no correlation with the question of the safety of the community.").

If the defendant proffers evidence to initially rebut the presumption of dangerousness or risk of non-appearance, the Court should then examine the following four factors in deciding whether release is appropriate:

> (1)    the nature and circumstances of the offense charged, including whether the offense . . . involves . . . a controlled substance . . . ;
>
> (2)    the weight of the evidence against the person;
>
> (3)    the history and characteristics of the person, including –
>
>> (A)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearances at court proceedings; and

**Government's Motion to Stay and Revoke Release Order**                    **Page 14**

(B)     whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal . . . ; and

(4)     the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.

18 U.S.C. § 3142(g).

## V.     The Court should Reverse the U.S. Magistrate Judge's Release order.

The defendant was selling significant amounts of methamphetamine and fentanyl, two extremely addictive, destructive, and deadly poisons that are killing people and contributing to cancerous criminal activity throughout the community.  Furthermore, the defendant has minimal ties to Oregon and extensive family ties to Mexico.  He unlawfully possessed three firearms.  He is facing a potential minimum of 10-years in federal prison.  The government ask that the Court detain the defendant pending trial as both a danger to the community and a risk of nonappearance.

### A.     Nature and Circumstances of the Offense.

The defendant's crime is extremely serious – he possessed with intent to distribute significant amounts of methamphetamine.  Furthermore, based upon the CS's conversations with one of his dispatchers and the messages and pictures found in the defendant's phone, the defendant was also involved in the distribution of fentanyl.  Illicit methamphetamine and fentanyl are both extremely addictive, destructive, and deadly.  Drug dealers like the defendant are exactly the people Congress warned us about and why they created the initial presumption of detention in these cases.  As Congress noted, drug dealers historically are prone to go back to dealing when they are released from custody in their efforts to continue making money.

**Government's Motion to Stay and Revoke Release Order**                    **Page 15**

According to the U.S. Pretrial Services Report, the defendant was unemployed at the time of his arrest and his prior employment was very limited – this is likely a motivating factor for the defendant's involvement in drug trafficking.  He has $39,000 in liabilities and a net legal monthly income of $0.  His monthly rent and car payments total $1,208.  This is a defendant who needs money and, if released, he has a huge incentive to go back to dealing drugs.  Although defendant may claim he won't do that now and will promise to get a job, he did not do so before when he had the opportunity and, given his status, he is still unable to legally work within the United States.  Should the defendant seek to go back to drug dealing there is not one condition or combination of conditions of supervision that can or will prevent him from doing so.

Furthermore, this is not a person dealing drugs to supply a personal addiction.  This was a defendant selling huge amounts of methamphetamine for a drug organization in Mexico to simply make money.

While the chances of the defendant actually dealing drugs while inside the Residential Re-Entry Center are low, that facility is not a secure facility – not even close to it – all the defendant has to do is walk through a door and he is back on the street and free to run to wherever he thinks he can.  If the defendant decides to leave the Residential Re-Entry Center the staff will not and cannot do anything to stop him from walking through the door.  All they can do is notify pretrial services and the court as the defendant walks away from them.  Once he is out of the Residential Re-Entry Center it is a safe bet that he will continue to flee and go back to dealing drugs again.

Additionally, the defendant unlawfully possessed three firearms – a semi-automatic assault-style rifle and two handguns, along with ammunition – which also reflects that the defendant is a risk to the community.  As an alien unlawfully in the United States the defendant

**Government's Motion to Stay and Revoke Release Order**                    **Page 16**

is not permitted to possess those firearms.  18 U.S.C. § 922(g)(5).  Furthermore, in receiving the firearms in exchange for drugs, the defendant possessed the firearms in furtherance of his drug trafficking offense and therefore has also violated 18 U.S.C. § 924(c)(1)(A).  *United States v. Mahan*, 586 F.3d 1185, 1188 (9th Cir. 2009) ("when one accepts a gun in exchange for drugs, the gun is an integral part of the drug sale because without the gun--the 'currency' for the purchase--the drug sale would not take place."); *see also United States v. Doody*, 600 F.3d 752, 755 (7th Cir. 2010) ("Receiving a gun in exchange for drugs--whether as payment or collateral--facilitates the drug transaction.").  Even though the defendant did not bring the firearms to the drug deal in which he was arrested, he still possessed those guns at his residence where the cash he collected from drug dealing was stored.  The presence of those firearms in the hands of the defendant also presented a grave risk to the community.

There is only one place to prevent the defendant from dealing methamphetamine and fentanyl again – despite any pleas he may make to the Court to the contrary – and that is in federal custody.

**B.      Weight of the Evidence.**

The proof against the defendant is summarized above and in the affidavit in support of the criminal complaint.  The case against the defendant is extremely strong and he should be detained.  While under the case law the weight of the evidence is the least important factor in the Court's decision making calculations, in reality it is likely the largest factor **for the defendant** in making a decision whether to flee or not.  As other courts have noted:

> The Court starts by considering the Defendant's incentives to flee from the possible consequences of this criminal case.  Broadly speaking, a defendant has an incentive to flee if he or she is facing a lengthy prison term and is likely to be convicted.  **Thus, the weight of the evidence against the defendant, along with the likely range of imprisonment**

> **should he be convicted, most often inform this analysis. In cases where significant evidence supports a crime with a lengthy sentence, there would be greater incentives to flee**.

*United States v. Perez-Hernandez*, 806 F.Supp.3d 1144, 1152-53 (S.D. Calif. Oct. 3, 2025) (finding a noncitizen defendant facing only a base offense level of 0-6 months and a statutory maximum of two years did not have a significant incentive to flee where defendant kept coming back to the United States and large incentive to maintain a life here) (emphasis added).

Here, this defendant has a huge incentive to flee. He was caught with significant amounts of methamphetamine and now faces a statutory maximum of life imprisonment and a mandatory minimum of 10-years' imprisonment. Furthermore, he only has minimal ties to Oregon and significant family ties to Mexico. He should be detained.

**C.    History and Characteristics of the Defendant.**

The history and characteristics of the defendant also warrants his continued detention as both a risk of non-appearance and as a danger to the community. Although the defendant does not have any criminal convictions he was caught illegally entering the United States in November 2023. The defendant was apprehended with a group of other migrants near Ajo, Arizona. He was arrested and subject to further processing. The defendant told immigration officials that he feared persecution or torture if returned to Mexico and he was then served with a Notice to Appear and placed in removal proceedings. The defendant was then released on his own recognizance into the United States pending the conclusion of those proceedings. Given his recent drug trafficking arrest, ICE has now placed a detainer on the defendant and will take him into custody for deportation proceedings whenever he is released from custody – whether it is while this case is pending or upon the completion of any sentence of imprisonment he may receive in the future. If deportation is an almost certain result if the defendant is convicted, it defies logic to expect him to remain at the Residential Re-Entry Center while he faces a

potentially very long federal prison sentence and then deportation when instead he can just run and try and avoid the prison sentence that is likely to result in this case.

In addition to the defendant illegally entering the United States, the evidence is that at some point this year he decided to accept employment from a drug trafficking organization in Mexico where, in return for a weekly salary, he would go get significant quantities of methamphetamine from California and then drive it back to Oregon, where he would in turn distribute it to customers. His arrest was not his first and only criminal act, but rather was the end of a pattern he had been engaging in. On two separate occasions he went to California and received between 30 to 40 pounds of methamphetamine that he then transported back to Oregon. While in Oregon, on multiple occasions he then delivered the methamphetamine to customers, collecting payment in return. The organization he worked for entrusted him with significant amounts of both cash and methamphetamine.

Furthermore, according to the Pretrial Report, after illegally entering the United States, the defendant lived in California for two years and only came to Oregon ten (10) months ago. For the past nine (9) months he has been living here in Oregon with his girlfriend and her daughter. His father, however, is in Mexico. His mother is in Mexico. His siblings are also in Mexico. He is single with no dependents. He does not own property in Oregon except for the vehicle he was paying for. He is also unemployed. He simply does not have substantial ties to Oregon that would keep him grounded here while awaiting a federal trial. Unfortunately, the existence of his girlfriend and her daughter – the extent of his community ties in Oregon – did absolutely nothing to deter him from becoming a drug dealer in the first place. To now hope that there will be a different result if the defendant is released is futile.

**Government's Motion to Stay and Revoke Release Order**                    **Page 19**

In making a flight determination, in addition to determining whether a defendant has an incentive to flee, the courts also look to see whether the defendant has the "practical ability to do so – either by fleeing the jurisdiction or by simply evading law enforcement within the jurisdiction" and in making this decision the court "can consider financial and other resources . . . and ties to people outside of the jurisdiction who could assist with their flight." *Perez-Hernandez*, 806 F.Supp.3d at 1153-54 (finding defendant did not have assets, sophisticated means, or family or friends outside the United States who could assist with flight to Mexico). Here, in addition to having a huge incentive to flee to avoid judgment, this defendant has family in Mexico and a skill set, being a lawyer, that he can absolutely go back to practicing in Mexico. The defendant has both the resources and ties that create a huge incentive for him to flee to Mexico.

While the defendant may claim he will not flee to Mexico due to a threat of persecution or torture, which is what he claimed in 2023 when he illegally entered the country, despite this professed fear he nevertheless went back to working with Mexico-based drug dealers once again. If he was so scared of them in 2023, then the last thing in the world he should have wanted to do is start working for them again. At no time when he was interviewed did the defendant ever claim he was working for this drug trafficking organization out of fear – rather, every indication is that he went back to working for them to simply make money. His prior claims about the threat of persecution or torture appear either contrived or to have subsided over time.

Based upon the defendant's history and characteristics, he is both a risk of nonappearance and danger to the community. Under the "totality of the circumstances," he should be detained.

///

**Government's Motion to Stay and Revoke Release Order**                    **Page 20**

**D.      Nature and Seriousness of the Danger to the Community.**

When we ask what is the nature and seriousness of the danger that the defendant would pose to the community if he was released, we are talking about the danger that he will go back to what he was doing – which was dealing methamphetamine, and based upon the messages in his phone apparently fentanyl as well.  Methamphetamine is a terrible drug that is ravaging our community.  Methamphetamine, along with fentanyl, are the primary causes of overdoses, both fatal and non-fatal, within the community and a host of other extensive criminal activity.  According to law enforcement:

> Fentanyl and methamphetamine remain the primary drug threats, affecting community livability and contributing to drug-related overdose deaths and criminal activity, including crimes against persons and property in the HIDTA region.  In 2023, fentanyl was linked to 75.9% of overdose deaths in Oregon and 51% in Idaho.  Methamphetamine was present in 63.5% of Oregon's overdose deaths and 38% of Idaho's.  Together, these two substances accounted for 41.3% of overdose fatalities in both states.

Oregon-Idaho High Intensity Drug Trafficking Area (HIDTA) 2026 Threat Assessment, 2025, at 5 (https://oridhidta.org/reports).

Given the presumption of detention that comes along with the charges, Congress has recognized that drug dealers like the defendant pose a serious risk to the community and that there is a substantial risk that they will return to dealing drugs, even while on supervision.  Given the added risks posed by the distribution of methamphetamine – we cannot bear that risk.  If the defendant was released, there is no condition or combination of conditions that this Court can impose that will sufficiently mitigate the risk that he will go back to transporting and distributing methamphetamine.  The defendant should be detained.

**VI.    Conclusion**

For the reasons set forth herein, we respectfully request that the Court stay the U.S. Magistrate's Release Order and, following a hearing and *de novo* review, find that under the "totality of the circumstances" the defendant poses an unacceptable risk of non-appearance at future court hearings and that he is a danger to the community and that he should remain in pretrial custody pending trial.  We ask the Court to find that:

- The charged offenses create a rebuttable presumption in 18 U.S.C. § 3142(e) that no combination of conditions will (1) reasonable assure the safety of the community and (2) reasonably assure the appearance of the defendant as required.

- The defendant has not rebutted, by sufficient evidence to the contrary, the presumption of detention provided in 18 U.S.C. § 3142(e).

- Furthermore, due to the nature of the offenses and the extreme dangers posed by the defendant's methamphetamine trafficking, there is no condition or combination of conditions that will reasonably assure the safety of other persons and the community if the defendant were released.

- Due to the weight of the evidence and the defendant's personal history and characteristics, including his ties to Mexico and the potential penalties he is facing on the current charges, no condition or combination of conditions will reasonably assure the appearance of the defendant at future court hearings as required if he was released from custody.

///

///

**Government's Motion to Stay and Revoke Release Order**                    **Page 22**

Based upon the above findings, the defendant should be detained pending trial.

Dated: May 29, 2026.                         Respectfully submitted,

                                             SCOTT E. BRADFORD
                                             United States Attorney


                                             /s/ *Scott Kerin*

                                             SCOTT M. KERIN, OSB # 965128
                                             Assistant United States Attorney